UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BOA TECHNOLOGY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MACNEIL ENGINEERING COMPANY,<br>INC.; PRIDE MANUFACTURING<br>COMPANY, LLC, doing business as<br>MacNeill Engineering doing business as<br>Pride Sports; MACNEILL PRIDE<br>GROUP CORP., doing business as Gathr<br>Outdoors,<br><br>Defendants. | Case No.:  23-cv-01431-GPC (JLB)<br><br>**CLAIM CONSTRUCTION ORDER** |

In the present action, Plaintiff BOA Technology, Inc. ("BOA") asserts claims of patent infringement against Defendants MacNeil Engineering Company, Inc. ("MECI"), Pride Manufacturing Company, LLC ("Pride"), and MacNeill Pride Group Corp. ("MPCG") (collectively, "Defendants"), alleging infringement of U.S. Patent Nos. 9,770,070 ("the '070 Patent"), 10,362,836 ("the '836 Patent"), 10,772,388 ("the '388 Patent"), and 11,633,020 ("the '020 Patent") (collectively, "the asserted patents").  (Doc. No. 47, FAC ¶¶ 46–69.)  On January 31, 2025, the parties filed their joint claim construction hearing statement, chart, and worksheet pursuant to Patent Local Rule 4.2,

identifying the disputed claim terms from the asserted patents.  (Doc. No. 78.)  On April 11, 2025, the parties each filed their opening claim construction briefs.  (Doc. Nos. 84, 85.)  On April 25, 2025, the parties each filed their responsive claim construction briefs.  (Doc. Nos. 89, 90.)

The Court held a claim construction hearing on May 23, 2025.[1]  After considering the parties' briefing and the arguments present at the hearing, the Court issues the following claim construction order.

## I.    BACKGROUND

Plaintiff BOA is the sole owner of the asserted patents.  (Doc. No. 47, FAC ¶¶ 20, 26, 32, 38.)  In the present action, BOA alleges that Defendants directly infringe one or more claims of the asserted patents, by selling and/or offering for sale "lace tensioning and closure devices used with various footwear, including but not limited to the Puma ALPHACAT NITRO Disc Spikeless Golf Shoes; and the Skechers GO GOLF Elite 5, Skechers GO GOLF Torque – Twist, Skechers Twist-Fit: GO RUN Pulse – Twisted, and Skechers Twist-Fit: Vector Matrix shoes."  (Id. ¶ 43; see id. ¶¶ 47, 53, 59, 65.)

The '070 Patent, the '388 Patent, and the '020 Patent are related patents, are all entitled "integrated closure device components and methods," and all share similar overlapping specifications.  U.S. Patent No. 9,770,070, at [54] (issued Sept. 26, 2017); U.S. Patent No. 10,772,388, at [54] (issued Sept. 15, 2020); U.S. Patent No. 11,633,020, at [54] (issued Apr. 25, 2023).  The '070 Patent was issued on September 26, 2017.  '070 Patent at [45].  The '388 Patent was issued on September 15, 2020.  '388 Patent at [45].  And the '020 Patent was issued on April 25, 2023.  '020 Patent at [45].

The specification of these patents explains that the disclosed invention relates to "closure devices for various articles, such as braces, medical devices, shoes, clothing, apparel, and the like.  Such articles typically include closure devices that allow the article

---

[1]    Prior to the May 23, 2025 claim construction hearing, the Court provided the parties with a tentative claim construction order.

to be placed and closed about a body part." '070 Patent at col. 1 ll. 15–19. Specifically, the embodiments disclosed in the specification provide closure systems having a reduced overall part and/or component count compared with conventional closure devices. Id. at col. 1 ll. 37–38, col. 5 ll. 28–30. "The reduced component count of the reel assembly simplifies the overall system, thereby reducing the cost and/or complexity of the system." Id. at col. 5 ll. 33–36. "The reduced component count may also reduce the risk of component or system breakage and/or malfunction." Id. at col. 5 ll. 36–40.

An exploded view of an embodiment of the claimed reel based closure device is depicted in the figure below from the specification:



*FIG. 12A*

3

Id. a fig. 12A.  The above embodiment of a reel based closure device is comprised of: "tightening component or knob 1202"; "pawl disc or drive component 1204"; "spool housing 1204"; "spool 1208"; "attachment or coupling component 1210"; and "bayonet 1212." Id. at col. 19 ll. 37–44.  The figure below displays how such a reel based closure device could be placed on an article of footwear:



**FIG. 1**

Id. a fig. 1.

As an exemplary claim of such a reel based closure device, independent claim 1 of the '070 Patent recites:

A reel assembly for tightening an article comprising:

a housing component having an interior region;

4

a spool component rotatably positioned within the interior region of the housing component, the spool component having an annular channel formed therein around which a tension member is gathered to tighten the article;

a drive component positioned axially above the spool component and operably coupled therewith to allow the spool component to rotate in a first direction within the housing component's interior region while preventing rotation of the spool component in a second direction;

a tightening component rotatably coupled within the housing and positioned axially above the drive component and coupled therewith such that operation of the tightening component causes the spool component to rotate within the housing component's interior region in the first direction to gather the tension member around the spool component's annular channel and thereby tighten the article, wherein the tightening component includes one or more radially protruding flanges that couple with a coupling feature of the housing component consisting of a single annular ridge; and

a central boss positioned axially below the spool component, the central boss protruding axially upward into the interior region of the housing component and being coaxially aligned with an aperture of the spool such that the spool rotates around the central boss;

wherein the one or more radially protruding flanges of the tightening component is configured to snap together couple with the single annular ridge of the housing component to fasten the housing component, the spool component, the drive component, and the tightening component together.

'070 Patent col. 25 l. 47 to col. 26 l. 26.

The '836 Patent is entitled "reel based closure system" and was issued on July 30, 2019. U.S. Patent No. 10,362,836, at [45], [54] (issued Jul. 30, 2019). The specification of the '836 Patent explains that the disclosed invention "relates to closure systems used in combination in any of a variety of applications including clothing, for example in a low-friction lacing system for footwear that provides equilibrated tightening pressure across a wearer's foot." Id. at col. 1 ll. 38–42.

An exploded view of an embodiment of such a reel based closure system is depicted in the figure below from the specification:

23-cv-01431-GPC (JLB)



FIG. 53

<u>Id.</u> at fig. 53.

The figure below displays how such a closure system could be placed on an article of footwear:



FIG. 47C

<u>Id.</u> at fig. 47C.

6

As an exemplary claim of the '836 Patent, independent claim 1 recites:

A closure system for tightening an article, the closure system comprising:

a base member having an inner cavity and an outer peripheral wall that surrounds the inner cavity, the base member also having a first end and a second end;

a housing member that is releasably mounted within the inner cavity of the base member, the housing member having a first end that is aligned with the first end of the base member and a second end that is aligned with the second end of the base member;

a spool rotatably positioned within an interior of the housing member, the spool being rotatable in a first direction to wind a tension member about the spool and the spool being rotatable in a second direction to unwind the tension member from about the spool; and

a knob member that is rotatably coupled with the housing member and that is operationally coupled with the spool so that rotation of the knob member causes the spool to rotate in the first direction;

wherein the first end of the base member includes a recessed channel near a bottom surface thereof and the second end of the base member includes a tab member near a top surface thereof;

wherein the first end of the housing member includes a first extending tab member near a bottom surface thereof and the second end of the housing member includes a second extending tab that extends from near the bottom surface of the housing member in a direction opposite the first extending tab; and

wherein the housing member and the base member are couplable to form a singular assembly.

Id. at col. 50 l. 55 to col. 51 l. 18.

On August 8, 2023, BOA filed a complaint for patent infringement against Defendant MECI, alleging infringement of the asserted patents. (Doc. No. 1, Compl.) On February 26, 2024, the Court granted BOA leave to file a first amended complaint, and the Court dismissed Defendant MECI's then pending motion to dismiss the complaint as moot. (Doc. No. 43.)

On February 28, 2024, BOA filed a first amended complaint adding Defendants Pride and MPGC as additional named defendants. (Doc. No. 47, FAC.) On August 23,

2024, the Court denied Defendants' motion to dismiss the first amended complaint as to MECI and MPGC and motion to transfer the action as to Pride. (Doc. No. 67.)

On September 6, 2024, Defendants filed an answer to BOA's complaint. (Doc. No. 70.) On September 23, 2024, the Court issued a scheduling order in the action. (Doc. No. 74.) By the present claim constructions briefs, charts, and worksheets, the parties request that the Court resolve seven claim construction disputes from the asserted patents. (Doc. Nos. 78, 84, 85, 89, 90.)

## II.    DISCUSSION

### A.    Legal Standards for Claim Construction

Claim construction is an issue of law for the court to decide. <u>Teva Pharms. USA, Inc. v. Sandoz, Inc.</u>, 574 U.S. 318, 326 (2015); <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370, 372 (1996). Although claim construction is ultimately a question of law, "subsidiary factfinding is sometimes necessary." <u>Teva</u>, 574 U.S. at 326.

"It is a 'bedrock principle' of patent law that the 'claims of a patent define the invention to which the patentee is entitled the right to exclude.'" <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citations omitted). "The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" <u>O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.</u>, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc)); <u>accord</u> <u>Kaufman v. Microsoft Corp.</u>, 34 F.4th 1360, 1369 (Fed. Cir. 2022).

Claim terms "'are generally given their ordinary and customary meaning[,]'" which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." <u>Phillips</u>, 415 F.3d at 1312–13. "In some cases, the ordinary meaning of claim language as understood by a [PHOSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." <u>Id.</u> at 1314. "However, in many cases, the meaning of a claim term as understood by persons of skill in the art is

23-cv-01431-GPC (JLB)

not readily apparent." O2 Micro, 521 F.3d at 1360.  If the meaning of the term is not readily apparent, the court must look to "'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" Phillips, 415 F.3d at 1314 (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004)).  "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence.'" Id. (quoting Innova, 381 F.3d at 1116); see Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1217–18 (Fed. Cir. 2014).

In determining the proper construction of a claim, a court should first look to the language of the claims.  See Allergan Sales, LLC v. Sandoz, Inc., 935 F.3d 1370, 1373 (Fed. Cir. 2019) ("'[C]laim construction must begin with the words of the claims themselves.'"); Source Vagabond Sys. Ltd. v. Hydrapak, Inc., 753 F.3d 1291, 1299 (Fed. Cir. 2014) ("'a claim construction analysis must begin and remain centered on the claim language itself'").  The context in which a disputed term is used in the asserted claims may provide substantial guidance as to the meaning of the term.  See Phillips, 415 F.3d at 1314.

A court must also read claims "in view of the specification, of which they are a part." Markman, 52 F.3d at 979; see 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.").  "'Apart from the claim language itself, the specification is the single best guide to the meaning of a claim term.'" Vederi, LLC v. Google, Inc., 744 F.3d 1376, 1382 (Fed. Cir. 2014) (quoting AIA Eng'g Ltd. v. Magotteaux Int'l S/A, 657 F.3d 1264, 1272 (Fed. Cir. 2011)).

But "[t]he written description part of the specification does not delimit the right to exclude.  That is the function and purpose of claims." Markman, 52 F.3d at 980.  Therefore, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." Dealertrack, Inc. v. Huber, 674 F.3d 1315, 1327 (Fed. Cir. 2012); accord Openwave Sys., Inc. v. Apple

1    Inc., 808 F.3d 509, 514 (Fed. Cir. 2015).

2        In addition to the claim language and the specification, the patent's prosecution

3    history may be considered if it is in evidence.  Phillips, 415 F.3d at 1317.  The prosecution

4    history "consists of the complete record of the proceedings before the [Patent and

5    Trademark Office ("PTO")] and includes the prior art cited during the examination of the

6    patent."  Id.  "Like the specification, the prosecution history provides evidence of how the

7    PTO and the inventor understood the patent."  Id.  "Yet because the prosecution history

8    represents an ongoing negotiation between the PTO and the applicant, rather than the final

9    product of that negotiation, it often lacks the clarity of the specification and thus is less

10   useful for claim construction purposes."  Id.  In addition, a court should also consult the

11   prosecution history "so that the court can exclude any interpretation that was disclaimed

12   during prosecution."  Sorensen v. Int'l Trade Comm'n, 427 F.3d 1375, 1378 (Fed. Cir.

13   2005) (citing Phillips, 415 F.3d at 1317).

14       In most situations, analysis of the intrinsic evidence will resolve claim construction

15   disputes.  See Vitronics, 90 F.3d at 1583; Teva, 574 U.S. at 331; see also Seabed

16   Geosolutions (US) Inc. v. Magseis FF LLC, 8 F.4th 1285, 1287 (Fed. Cir. 2021) ("If the

17   meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to

18   extrinsic evidence.").  However, "[w]here the intrinsic record is ambiguous, and when

19   necessary," district courts may "rely on extrinsic evidence, which 'consists of all evidence

20   external to the patent and prosecution history, including expert and inventor testimony,

21   dictionaries, and learned treatises.'"  Power Integrations, Inc. v. Fairchild Semiconductor

22   Int'l, Inc., 711 F.3d 1348, 1360 (Fed. Cir. 2013) (quoting Phillips, 415 F.3d at 1317).  A

23   court must evaluate all extrinsic evidence in light of the intrinsic evidence.  Phillips, 415

24   F.3d at 1319.  "'[E]xtrinsic evidence is to be used for the court's understanding of the

25   patent, not for the purpose of varying or contradicting the terms of the claims.'"  Genuine

26   Enabling Tech. LLC v. Nintendo Co., 29 F.4th 1365, 1373 (Fed. Cir. 2022); see also

27   Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283, 1290 (Fed. Cir. 2015) ("Extrinsic

28   evidence may not be used 'to contradict claim meaning that is unambiguous in light of the

23-cv-01431-GPC (JLB)

intrinsic evidence.'"). In cases where subsidiary facts contained in the extrinsic evidence "are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence." Teva, 574 U.S. at 332.

"[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." O2 Micro, 521 F.3d at 1362; see also Eon Corp. IP Holdings v. Silver Spring Networks, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) ("'[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.'"). In certain situations, it is appropriate for a court to determine that a claim term needs no construction and its plain and ordinary meaning applies. O2 Micro, 521 F.3d at 1360; Phillips, 415 F.3d at 1314. But "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." O2 Micro, 521 F.3d at 1361. If the parties dispute the scope of a certain claim term, it is the court's duty to resolve the dispute. Id. at 1362; Eon, 815 F.3d at 1319.

## B.  Disputed Claim Terms

### 1.  The '070 Patent

#### a.  "drive component"

Defendants propose that the Court construe the term "drive component" from the '070 Patent as being a means-plus-function limitation under 35 U.S.C. § 112(f) with the corresponding structure of "pawl disk 1204 with pawl teeth and a central aperture or plurality of recesses, as shown and described in FIGs. 12A-O and Col. 19:53 through 20:30, Col. 22:32. through Col. 23:22, and Col. 23:56 through 24:4" and the corresponding function of "allow the spool component to rotate in a first direction within the housing component's interior region while preventing rotation of the spool component in a second direction." (Doc. No. 84 at 16.) Defendants propose, in the alternative, that, if the Court determines that the claim term is not a means-plus-function limitation, then the term should be construed as "a single unitary part to drive rotation." (Id. at 20.) BOA contends that

the claim term is not subject to 35 U.S.C. § 112(f) and no construction is necessary.  (Doc. No. 85 at 5.)

Means-plus-function claiming occurs when a claim term is drafted in a manner that invokes § 112(f), formerly § 112 ¶ 6.  Diebold Nixdorf, Inc. v. Int'l Trade Comm'n, 899 F.3d 1291, 1297 (Fed. Cir. 2018); see also Dyfan, LLC v. Target Corp., 28 F.4th 1360, 1365 (Fed. Cir. 2022) ("Limitations that invoke § 112 ¶ 6 are generally known as 'means-plus-function' or 'step-plus-function' limitations.").  Section 112(f) of the Patent Act provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112(f) (current); accord 35 U.S.C. § 112 ¶ 6 (pre-AIA).[2]  In enacting this provision, Congress "'struck a balance in allowing patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function,' while 'placing specific constraints on how such a limitation is to be construed'— that is, by restricting the 'scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof.'"  Diebold Nixdorf, 899 F.3d at 1297 (quoting Williamson v. Citrix Online, LLC, 792 F.3d 1339, 1347 (Fed. Cir. 2015) (en banc)).

"The overall means-plus-function analysis is a two-step process."  Dyfan, 28 F.4th at 1365.  "The first step is to determine whether a claim limitation is drafted in means-plus-function format, which requires [the court] to construe the limitation to determine whether it connotes sufficiently definite structure to a person of ordinary skill in the art."  Id.  "If

---

[2]    The Court notes that the above language in the current version of § 112(f) is identical to the language in paragraph 6 of the pre-AIA version of § 112.  Compare 35 U.S.C. § 112(f) with 35 U.S.C. § 112 ¶ 6 (pre-AIA).

the limitation connotes sufficiently definite structure, it is not drafted in means-plus-function format, and § 112 ¶ 6 does not apply." Id.  If, however, the court concludes that the limitation is in means-plus-function format, the court performs the second step of "determining 'what structure, if any, disclosed in the specification corresponds to the claimed function.'" Id. (quoting Williamson, 792 F.3d at 1351).

"If the limitation uses the word 'means,' there is a rebuttable presumption that § 112 ¶ 6 applies." Rain Computing, Inc. v. Samsung Elecs. Am., Inc., 989 F.3d 1002, 1005 (Fed. Cir. 2021).  "If not, there is a rebuttable presumption that the provision does not apply." Id.  But "the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" Williamson, 792 F.3d at 1349.  "Whether claim language invokes 35 U.S.C. § 112 ¶ 6 is a question of law." Rain, 989 F.3d at 1005.

Here, the limitation at issue – "drive component" – does not use the precise word "means." '070 Patent col. 26 l.1.  Therefore, there is a rebuttable presumption that § 112(f) does not apply. See, e.g., Rain, 989 F.3d at 1005; Fintiv, Inc. v. PayPal Holdings, Inc., 134 F.4th 1377, 1381 (Fed. Cir. 2025).  In order for this presumption to be overcome, Defendants must demonstrate "that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" Williamson, 792 F.3d at 1349.

"One way to demonstrate that a claim limitation fails to recite sufficiently definite structure is to show that, although not employing the word 'means,' the claim limitation uses a similar 'nonce word that can operate as a substitute for 'means' in the context of § 112, para. 6.'" MTD Prods. Inc. v. Iancu, 933 F.3d 1336, 1341 (Fed. Cir. 2019) (quoting Williamson, 792 F.3d at 1350); Zeroclick, LLC v. Apple Inc., 891 F.3d 1003, 1008 (Fed. Cir. 2018) (Nonce words "can operate as substitutes for 'means' and presumptively bring the disputed claims limitations within the ambit of § 112, ¶ 6.").  The Federal Circuit has explained: "Generic terms such as 'mechanism,' 'element,' 'device,' and other nonce

words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure' and therefore may invoke § 112, para. 6." <u>Williamson</u>, 792 F.3d at 1350; <u>accord</u> <u>Dyfan</u>, 28 F.4th at 1365; <u>see also</u> <u>Egenera, Inc. v. Cisco Sys., Inc.</u>, 972 F.3d 1367, 1373 (Fed. Cir. 2020) (Nonce words "may amount to 'generic terms or black box recitations of structure or abstractions.'" (quoting <u>MTD</u>, 933 F.3d at 1341). When evaluating a claim term containing a nonce word, the "critical question is whether 'the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure,' including either a particular structure or a class of structures." <u>MTD</u>, 933 F.3d at 1341. "'What is important is . . . that the term, as the name for structure, has a reasonably well understood meaning in the art.'" <u>Dyfan</u>, 28 F.4th at 1365 (quoting <u>Greenberg v. Ethicon Endo-Surgery, Inc.</u>, 91 F.3d 1580, 1583 (Fed. Cir. 1996)).

The limitation at issue – "drive component" – uses the word "component." '070 Patent col. 26 l.1. Numerous courts have found the term "component" to be a nonce word that does not designate structure. <u>Amdocs (Israel) Ltd. v. Openet Telecom, Inc.</u>, No. 110CV910LMBJFA, 2018 WL 1699429, at *19 (E.D. Va. Apr. 6, 2018) (citing <u>Umbanet Inc. v. Epsilon Data Management, LLC</u>, No. 2:16–cv–682–JRG, 2017 WL 3508771, at *7 (E.D. Tex. Aug. 16, 2017)); <u>see, e.g.</u>, <u>Cypress Lake Software, Inc. v. Samsung Elecs. Am., Inc.</u>, 382 F. Supp. 3d 586, 621–22 (E.D. Tex. 2019). Nevertheless, the Federal Circuit has explained: "even if the claims recite a nonce term followed by functional language, other language in the claim 'might inform the structural character of the limitation-in-question or otherwise impart structure' to the claim term." <u>MTD</u>, 933 F.3d at 1341–42 (quoting <u>Williamson</u>, 792 F.3d at 1351). "The ultimate question is whether 'the claim language, read in light of the specification, recites sufficiently definite structure to avoid § 112, ¶ 6.'" <u>Id.</u> at 1342. Therefore, the Court will review the remainder of the relevant claim language to determine if its recites sufficiently definite structure.

BOA contends that although the claim term uses the word "component," a POSITA would understand the overall term "drive component" as reciting sufficient structure.

(Doc. No. 85 at 5.)  BOA notes that the claim language places the structural modifier "drive" in front of the word "component." (Doc. No. 90 at 8–9.)  BOA contends that "a drive" is inherently structural.  (Id. at 9.)  To support this contention, BOA has provided the Court with a technical dictionary containing a definition for the term "drive."  (See Doc. No. 85-7, Ex. G; see also Doc. No. 85-5, Tipton Decl. ¶ 65.)  However, the definition for the term "drive" set forth in the technical dictionary simply explains the function of a "drive" (that it transmits power to wheels or propellers); the definition does not set forth any particular structure for a "drive."  (See Doc. No. 85-7, Ex. G (defining "drive" as "a device that transmits power to wheels or propellers").)  Thus, BOA has failed to show that the word "drive" in this context would be inherently structural to a POSITA.  Indeed, the extrinsic evidence presented supports the opposite conclusion.  Thus, the word "drive" simply adds function, not structure, to the nonce word "component," which itself does not convey a sufficiently definite structure.

BOA also notes that the claim language explains that the "drive component" must be positioned axially above the spool component and operably coupled with the spool component. (Doc. No. 85 at 5 (citing '070 Patent col. 26 ll. 1–2).)  But this claim language merely explains where the drive component is positioned within the overall claimed reel assembly.  See '070 Patent col. 26 ll. 1–7.  The identified language says nothing about the supposed structure of the "drive component" itself.  This is insufficient to connote a sufficiently definite structure to a POSITA.  See, e.g., MTD, 933 F.3d at 1343 (finding claim language explaining "that the mechanical control assembly is 'coupled to the left and right drive units'" insufficient to remove the claim term at issue (mechanical control assembly) from the ambit of § 112, ¶ 6).

BOA also notes that the specification describes certain structural features of the drive component.  (Doc. No. 85 at 5 (citing '070 Patent col. 20 ll. 1–10, figs. 12B-J).)  But the identified passages are structural descriptions of an "embodiment" of the invention – specifically, the embodiment depicted in figures 12B-J of the specification containing "pawl disc or drive component 1204."  See '070 Patent col. 5 ll. 13–14, col. 20 ll. 1–10.

15

"[A] preferred embodiment disclosed in the specification cannot impart structure to a term that otherwise has none." MTD, 933 F.3d at 1341. "That the specification discloses a structure corresponding to an asserted means-plus-function claim term does not necessarily mean that the claim term is understood by persons of ordinary skill in the art to connote a specific structure or a class of structures." Id. at 1344. As such, the passages in the specification relied on by BOA are insufficient to demonstrate that the term "drive component" is used by POSITAs to convey a particular structure or a class of structures. Accordingly, Defendants have rebutted the presumption that § 112(f) does not apply and demonstrated that the claim language at issue fails to convey sufficiently definite structure. As such, the Court holds that the claim term "drive component" in the '070 Patent is a means-plus-function limitation under § 112(f).

Because the term "drive component" in the '070 Patent is a means-plus-function limitation, the Court must now perform the step of "determining 'what structure, if any, disclosed in the specification corresponds to the claimed function.'" Dyfan, 28 F.4th at 1365 (quoting Williamson, 792 F.3d at 1351). The parties agree that the claimed function of the "drive component" is "to allow the spool component to rotate in a first direction within the housing component's interior region while preventing rotation of the spool component in a second direction." (Doc. No. 84 at 16, 18; Doc. No. 85 at 7.) '070 Patent col. 26 ll. 2–5.

However, the parties dispute the proper corresponding structure for that claimed function. Defendants contend that the relevant corresponding structure should be limited to the preferred embodiment depicted in figures 12A-O of the specification. (Doc. No. 84 at 19.) Defendants argue that such a limitation is proper because, during the prosecution of the '070 Patent, the patentee limited the scope of the claims to that specific embodiment. (Doc. No. 84 at 18–19.) In response, Plaintiff argues that no such prosecution history disclaimer occurred. (See Doc. No. 90 at 2–3, 9–10.)

"Prosecution disclaimer 'preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.'" Aylus Networks, Inc. v.

16

*Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017) (quoting *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003)).  "[T]he doctrine of prosecution disclaimer ensures that claims are not 'construed one way in order to obtain their allowance and in a different way against accused infringers.'"  *Id.* at 1360 (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995)).

"Such disclaimer can occur through amendment or argument."  *Id.* at 1359.  But "[f]or a statement during prosecution to qualify as a disavowal of claim scope, it must be 'so clear as to show reasonable clarity and deliberateness,' and 'so unmistakable as to be unambiguous evidence of disclaimer.'"  *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022); *see also* *Aylus*, 856 F.3d at 1361 ("[T]o invoke the doctrine of prosecution disclaimer, any such statements must 'be both clear and unmistakable.'"); *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008) ("Prosecution disclaimer does not apply to an ambiguous disavowal.").  "Thus, when [a] patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered."  *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013).

In evaluating whether there has been a prosecution disclaimer, a court must take care "to interpret purported disavowals in the context of the prosecution history as a whole."  *Azurity Pharms., Inc. v. Alkem Lab'ys Ltd.*, 133 F.4th 1359, 1366 (Fed. Cir. 2025) (citing *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009)).  In addition, "'[t]he party seeking to invoke prosecution history disclaimer bears the burden of proving the existence of a clear and unmistakable disclaimer that would have been evident to one skilled in the art.'"  *Genuine Enabling Tech.*, 29 F.4th at 1374.

At the claim construction hearing, Defendants argued that they are not making a prosecution history disclaimer argument, and, therefore, their arguments should not be evaluated under the above standards for prosecution history disclaimers.  Defendants contend that they are merely explaining what evidence in the intrinsic record clearly links

or associates structure to the function recited in the claim language.  The Court rejects Defendants' characterization of their arguments.  Defendants' position is that the scope of the claims should be narrowed based on representations BOA made to the PTO during the prosecution of the '070 Patent.  (See Doc. No. 84 at 18–19.)  That is a prosecution history disclaimer argument, and the Court will evaluate it as such.  See Genuine Enabling, 29 F.4th at 1374; Aylus, 856 F.3d at 1359; Biogen Idec, 713 F.3d at 1095.

During the prosecution of the '070 Patent, the examiner initiated a restriction requirement.  (See Doc. No. 90-2, Ex. Q.)  The examiner explained that the application at issue (Application No. 14/297,047) contained claims directed to eight patentably distinct species, and, therefore, the examiner required the patentee to elect under 35 U.S.C. § 121 "a single disclosed species, or a single grouping of patentably indistinct species, for prosecution on the merits."  (Id. at 2.)  The examiner explained that the eight species at issue were "independent or distinct because of mutually distinct characteristics disclosed in the housing, spool, and attachment components.  In addition, these species are not obvious variants of each other based on the current record."  (Id.)  In response, the patentee elected to proceed with species 8, which was the embodiment depicted in figures 12A-O of the specification.  (Doc. No. 84-14, Ex. 13 at pp. 147, 160).  Defendants argue that the scope of the relevant disclosed structures were limited when the patentee made that species election.  (Doc. No. 84 at 18–19.)

But there are several reasons why no clear and unmistakable disclaimer occurred through that species election.  First, the examiner's express reason for requiring the election was based on other components of the claimed reel assembly (the housing, spool, and attachment components), not the components at issue (the drive component and the tightening component).  (See Doc. No. 90-2, Ex. Q at 2.)  Second, when the examiner subsequently allowed claim 1 of the '070 Patent, the examiner removed the restriction requirement, stating "[t]he restriction requirement is hereby withdrawn as to any claim that requires all the limitations of an allowable claim.  Specifically, the restriction requirement of Species 1-8 is partially withdrawn."  (Doc. No. 90-4, Ex. S at 2.)  In light of the above,

there was no clear and unequivocal disavowal of claim scope limiting the drive component or the tightening component of the claimed invention to the embodiment depicted in figures 12A-O during the prosecution history.  See, e.g., Plantronics, Inc. v. Aliph, Inc., 724 F.3d 1343, 1350–51 (Fed. Cir. 2013) (finding examiner restriction requirement insufficient to constitute prosecution disclaimer and explaining "[t]he election of an invention in response to an ambiguous restriction requirement in turn cannot be said to provide any guidance forming a basis for narrowing a broadly drafted claim.").  Indeed, at the claim construction hearing, Defendants conceded that the species election was insufficient to constitute a clear and unequivocal disavowal of claim scope.  Accordingly, the Court rejects Defendants' prosecution history disclaimer argument.

At the claim construction hearing, Defendants also argued that "pawl disc 1204" from figures 12A-O of the specification is the only proper corresponding structure identified in the specification because the embodiment depicted in figures 12A-O is the only reel assembly embodiment in the specification that contains a central boss.  The Court acknowledges that independent claim 1 of the '070 requires that one of the components of the claimed reel assembly device be "a central boss."  '070 Patent col. 26 l. 16.  But, at this step of the analysis, the Court's job is to determine "'what structure, if any, disclosed in the specification corresponds to the claimed function.'"  Dyfan, 28 F.4th at 1365 (quoting Williamson, 792 F.3d at 1351).  Defendants, along with BOA, agree that the claimed function of the "drive component" is "to allow the spool component to rotate in a first direction within the housing component's interior region while preventing rotation of the spool component in a second direction."  (Doc. No. 84 at 16, 18.)  Other drive components identified in the specification, such as "pawl disc 640" and "pawl disc 1106," are capable of performing that specific function.[3]  See '070 Patent col. 8 l. 6 to col. 9 l. 6, col 18 l. 6 to

---

[3]    The Court concedes that the preferred embodiments depicted in figures 6A-K and 11A-P do not contain a central boss.  But Defendants fail to adequately explain why the specific components at issue – "pawl disc 640" and "pawl disc 1106" – could not be used

23-cv-01431-GPC (JLB)

col. 19 l. 19, figs. 6A-K, figs. 11A-P.  As such, those structures should be included in the Court's construction for this means-plus-function claim term.  See Versa Corp. v. Ag-Bag Int'l Ltd., 392 F.3d 1325, 1329 (Fed. Cir. 2004) ("'[W]hen multiple embodiments in the specification correspond to the claimed function, proper application of § 112, ¶ 6 generally reads the claim element to embrace each of those embodiments.'" (quoting Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1258 (Fed. Cir. 1999))).  Accordingly, the Court rejects Defendants' proposed corresponding structure and instead the Court will adopt a slightly modified version of the corresponding structure identified by BOA.[4]

In sum, the Court construes the claim term "drive component" in the '070 Patent as a means-plus-function claim limitation under 35 U.S.C. § 112(f).  The claimed function of the term is "to allow the spool component to rotate in a first direction within the housing component's interior region while preventing rotation of the spool component in a second direction."  '070 Patent col. 26 ll. 2–4.  And the corresponding structure is "drive component 1204"/"pawl disc 1204" described at 19:37-25:8 and FIGS. 12A-O; "pawl or disc drive 640" described at 8:6-9:6, 10:21-35, FIGS. 6A-K; "a pawl disc with spring 708" described at 10:36-11:3, FIGS. 7A-C; "a spool with pawls 806" described at 11:23-12:40,

---

in a reel assembly device that contains a central boss.  As such, the requirement of "a central boss" in the claim language of independent claim one does not appear to preclude other drive components identified in the specification, such as "pawl disc 640" and "pawl disc 1106" from performing the required function.

[4]    In proposing a corresponding structure for the "drive component," BOA lists "the 'drive component' in the Abstract and at 1:35-54, 2:5-3:4, 3:52-4:11" and "'drive component (e.g. pawl disc)' as described at 24:10-25:8."  (Doc. No. 85 at 7.)  These descriptions of the "drive component" (similar to the descriptions in the claim language) simply describe the "drive component" in terms of function using nonce words.  Because these descriptions do not provide any specific structure for the term "drive component," the Court will not include these sections of the specification as part of the identified corresponding structure for this claim term.  See Williamson, 792 F.3d at 1352 ("Even if the specification discloses corresponding structure, the disclosure must be of 'adequate' corresponding structure to achieve the claimed function.").

13:14-30, FIGS. 8A-L; the "pawl disc" described at 14:2-14:67; FIGS. 9A-C, J-M; "pawl disc 1106" described at 18:4-19:36; FIGS. 11A-P; "pawl disc 1204" described at 19:37-20:67, FIGS. 12A-N; "component 986" "(e.g., a pawl disc, dial, integrated knob and pawl mechanism, and the like)" described at 15:58-16:4; FIGS. 9J-K; "pawl teeth 904 of knob 902" and "spool teeth 905" as described at 13:59-14:48; FIGS. 9A-C, J-M.

### b.    "tightening component"

Defendants propose that the Court construe the term "tightening component" from the '070 Patent as being a means-plus-function limitation under 35 U.S.C. § 112(f) with the corresponding structure of "knob 1202 with snap-in locking protrusions 1203 and a shoulder, as shown and described in FIGs. 12A-O and Col. 19:53 through 20:30, Col. 22:32 through Col. 23:22, and Col. 23:56 through 24:4" and the corresponding function of "causes the spool component to rotate within the housing component's interior region in the first direction to gather the tension member around the spool component's annular channel and thereby tighten the article." (Doc. No. 84 at 20–21.) Defendants propose, in the alternative, that, if the Court determines that the claim term is not a means-plus-function limitation, then the term should be construed as "a single unitary part for tightening." (Id. at 22.) BOA contends that the claim term is not subject to 35 U.S.C. § 112(f) and no construction is necessary. (Doc. No. 85 at 8–9.)

Here, the limitation at issue – "tightening component" – does not use the precise word "means." '070 Patent col. 26 l. 6. Therefore, there is a rebuttable presumption that § 112(f) does not apply. See, e.g., Rain, 989 F.3d at 1005; Fintiv, 134 F.4th at 1381. In order for this presumption to be overcome, Defendants must demonstrate "that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" Williamson, 792 F.3d at 1349. "One way to demonstrate that a claim limitation fails to recite sufficiently definite structure is to show that, although not employing the word 'means,' the claim limitation uses a similar 'nonce word that can operate as a substitute for 'means' in the context of § 112, para. 6.'" MTD, 933 F.3d at 1341 (quoting Williamson, 792 F.3d at 1350); Zeroclick, 891 F.3d at

1008 (Nonce words "can operate as substitutes for 'means' and presumptively bring the disputed claims limitations within the ambit of § 112, ¶ 6.").

The claim term "tightening component" includes the word "component." The word "component" is a nonce word that does not designate structure. <u>See</u> <u>Amdocs</u>, 2018 WL 1699429, at *19 ("[N]umerous courts have found that generic terms such as 'component' or 'device' are nonce words."); <u>see, e.g.</u>, <u>Cypress Lake Software</u>, 382 F. Supp. 3d at 621–22. Nevertheless, the Federal Circuit has explained: "even if the claims recite a nonce term followed by functional language, other language in the claim 'might inform the structural character of the limitation-in-question or otherwise impart structure' to the claim term." <u>MTD</u>, 933 F.3d at 1341–42 (quoting <u>Williamson</u>, 792 F.3d at 1351). "The ultimate question is whether 'the claim language, read in light of the specification, recites sufficiently definite structure to avoid § 112, ¶ 6.'" <u>Id.</u> at 1342. Therefore, the Court will review the other language in independent claim 1 of the '070 Patent.

The claim language places the word "tightening" in front of the word "component," but the word "tightening" is a functional word that does not designate structure. <u>See</u> <u>Merriam-Webster Dictionary</u>, https://www.merriam-webster.com/dictionary/tightening (defining "tightening" as "to make tight or tighter"). As such, the inclusion of the word "tightening" before the word "component" is not sufficient to convey a definite structure.

Other language in independent claim 1 of the '070 Patent explains that the tightening component is "rotatably coupled within the housing and positioned axially above the drive component and coupled therewith." '070 Patent col. 26 ll. 6–8. This claim language simply explains how the tightening component is positioned within the overall claimed reel assembly and does not impart any specific structure on the tightening component. Additional claim language states that "the tightening component includes one or more radially protruding flanges that couple with a coupling feature of the housing component consisting of a single annular ridge." <u>Id.</u> at col. 26 ll. 12–15. The Court acknowledges that this language imparts some structure on the tightening component as it requires that the tightening component include a protruding flange. But language merely requiring one or

more protruding flanges is still insufficient to convey the required sufficiently definite structure needed to avoid § 112(f).  See, e.g., MTD, 933 F.3d at 1343 (finding claim language explaining "that the mechanical control assembly is 'coupled to the left and right drive units'" insufficient to remove the claim term at issue (mechanical control assembly) from the ambit of 112, ¶ 6).

BOA also contends that the specification uses the term "tightening component" to refer to a specific class of structures.  (Doc. No. 85 at 9 (citing '070 Patent col. 19 ll. 18–44).)  But the identified passages are structural descriptions of an "embodiment" of the invention containing "tightening component or knob 1202."  See '070 Patent col. 19 ll. 37–41.  "[A] preferred embodiment disclosed in the specification cannot impart structure to a term that otherwise has none."  MTD, 933 F.3d at 1341.  "That the specification discloses a structure corresponding to an asserted means-plus-function claim term does not necessarily mean that the claim term is understood by persons of ordinary skill in the art to connote a specific structure or a class of structures."  Id. at 1344.  As such, the passages in the specification relied on by BOA are insufficient to demonstrate that the term "tightening component" is used by POSITAs to designate a particular structure or a class of structures.  Accordingly, Defendants have rebutted the presumption that § 112(f) does not apply and demonstrated that the claim language at issue fails to convey sufficiently definite structure.  As such, the Court holds that the claim term "tightening component" in the '070 Patent is a means-plus-function limitation under § 112(f).

Because the term "tightening component" in the '070 Patent is a means-plus-function limitation, the Court must now perform the step of "determining 'what structure, if any, disclosed in the specification corresponds to the claimed function.'"  Dyfan, 28 F.4th at 1365 (quoting Williamson, 792 F.3d at 1351).  The parties agree that the claimed function of the "tightening component" is "causes the spool component to rotate within the housing component's interior region in the first direction to gather the tension member around the spool component's annular channel and thereby tighten the article."  (Doc. No. 84 at 21; Doc. No. 85 at 11.)  '070 Patent col. 26 ll. 9–13.

The parties dispute the relevant corresponding structure for the "tightening component." Defendants again argue that the corresponding structure for this claim term should be limited to the preferred embodiment depicted in Figures 12A-O of the specification. (Doc. No. 84 at 22.) The Court rejects this argument for the same reasons it rejected the identical argument in construing the claim term "drive component." See Order at Section B.1.a. As explained above, there was no clear and unequivocal disavowal of claim scope limiting the drive component or the tightening component of the claimed invention to Figures 12A-O of the specification during the prosecution history. Further, other structures beside the tightening component in Figures 12A-O are capable of performing the claimed function. Accordingly, the Court rejects Defendants' proposed corresponding structure, and, instead, the Court will adopt a slightly modified version of the corresponding structure identified by BOA.[5] See Versa, 392 F.3d at 1329.

In sum, the Court construes the claim term "tightening component" in the '070 Patent as a means-plus-function claim limitation under 35 U.S.C. § 112(f). The claimed function of the term is "causes the spool component to rotate within the housing component's interior region in the first direction to gather the tension member around the spool component's annular channel and thereby tighten the article." '070 Patent col. 26 ll. 9–13. And the corresponding structure is "a knob 218" described at 6:14-7:11 and FIGS. 2-4; "cover with grip 512" described at 7:30-49 and FIG. 5A; "knob 504" described at

---

[5]    In proposing a corresponding structure for the "tightening component," BOA lists "the 'tightening component' in the Abstract and at 2:5-10, 3:36-4:43" and "'tightening component (e.g. knob)' as described at 24:10-25:8." (Doc. No. 85 at 11.) These descriptions of the "tightening component" (similar to the descriptions in the claim language) simply describe the "tightening component" in terms of function using nonce words. Because these descriptions do not provide any specific structure to the term "tightening component," the Court will not include these sections of the specification as part of the identified corresponding structure for this claim term. See Williamson, 792 F.3d at 1352 ("Even if the specification discloses corresponding structure, the disclosure must be of 'adequate' corresponding structure to achieve the claimed function.").

7:50-8:5 and FIG. 5C; "knob 660" described at 8:44-60, 9:7-27, 9:55-10:18 and FIGS. 6A-K; "cover with grip 712" described at 10:36-54 and FIG. 7A; "grip 808" described at 11:52-12:60 and FIGS 8D-J; "knob 902" described at 13:53-14:48 and FIGS. 9A-O; "knob 926" described at 14:49-67 and FIGS. 9D-F; "knob 954" described at 15:1-26 and FIGS 9N-O; "knob 986" described at 15:58-16:17 and FIGS. 9J-K; and "knob 1102" described at 18:4-19:36 and FIGS 11B-H; "knob 1202" described at 19:37-24:4 and FIGS. 12A-N.

      2.   The '836 Patent

          a.   "releasably mounted"

Defendants argue that the claim term "releasably mounted" from the '836 Patent is indefinite. (Doc. No. 84 at 9–12.) Defendants propose in the alternative that, if the Court determines that the claim term is not indefinite, that the term be construed as "easily removable without tools and without loss or damage." (Id. at 14.) BOA contends that the claim term is not indefinite and that no construction for the claim term is required. (Doc. No. 85 at 13–14.)

"Definiteness is a statutory requirement for patentability." Niazi, 30 F.4th at 1346. Under 35 U.S.C. § 112(b), a patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as the invention." 35 U.S.C. § 112(b).

"A claim fails to satisfy this statutory requirement and is thus invalid for indefiniteness if its language, when read in light of the specification and the prosecution history, 'fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'" Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364, 1369–70 (Fed. Cir. 2014) (quoting Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 901 (2014)); see Infinity Computer Prod., Inc. v. Oki Data Americas, Inc., 987 F.3d 1053, 1059 (Fed. Cir. 2021) ("'[W]e look to the patent record—the claims, specification, and prosecution history—to ascertain if they convey to one of skill in the art with reasonable certainty the scope of the invention claimed.'" (quoting Teva Pharms. USA, Inc. v. Sandoz, Inc., 789 F.3d 1335, 1341 (Fed. Cir. 2015))). This "reasonable certainty" standard "reflects a

'delicate balance' between 'the inherent limitations of language' and providing 'clear notice of what is claimed.'" Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n, 936 F.3d 1353, 1359 (Fed. Cir. 2019). "Th[e] standard 'mandates clarity, while recognizing that absolute precision is unattainable.'" Nevro Corp. v. Bos. Sci. Corp., 955 F.3d 35, 39 (Fed. Cir. 2020) (quoting Nautilus, 572 U.S. at 910); see also BASF Corp. v. Johnson Matthey Inc., 875 F.3d 1360, 1365 (Fed. Cir. 2017) ("'Reasonable certainty' does not require 'absolute or mathematical precision.'").

"General principles of claim construction apply to indefiniteness allegations." HZNP Medicines LLC v. Actavis Lab'ys UT, Inc., 940 F.3d 680, 688 (Fed. Cir. 2019). The party asserting indefiniteness bears "the burden of proving indefiniteness by clear and convincing evidence." BASF, 875 F.3d at 1365 (citing Biosig Instruments, Inc. v. Nautilus, Inc., 783 F.3d 1374, 1377 (Fed. Cir. 2015)); see also Microsoft Corp. v. i4i Ltd. P'ship, 564 U.S. 91, 95 (2011) (holding that 35 U.S.C. § 282 "requires an invalidity defense to be proved by clear and convincing evidence").

Independent claim 8 of the '836 Patent recites a "closure system" comprising, among other things: "a housing member that is releasably mounted within the inner cavity of the base member." '836 Patent col. 51 ll. 43, 45–46. Defendants contend that the claim term "releasably mounted" is indefinite because the term could be understood to mean multiple things. (Doc. No. 84 at 10.) "'[A] claim is indefinite if its language might mean several different things and no informed and confident choice is available among the contending definitions.'" HZNP Medicines, 940 F.3d at 698 (quoting Media Rts. Techs., Inc. v. Cap. One Fin. Corp., 800 F.3d 1366, 1371 (Fed. Cir. 2015)). Defendants contend that the term "releasably mounted" can potentially mean the following: (1) a device can be removed by hand and without loss or damage; (2) a device can be removed using special tools and without loss or damages; and (3) a device can be removed but with damage or destruction. (Doc. No. 84 at 10.)

Defendants appear to take the position that the term "releasably mounted" is ambiguous because the word "releasable" must mean either: (1) that the item is releasable

by hand; or (2) that item is releasable only via special tools.  This is a false dichotomy by Defendants, and the Court rejects it.

The word "releasable" is a common word with the widely accepted meaning of "capable of being released." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 1917 (1981); THE AMERICAN HERITAGE DICTIONARY, https://www.ahdictionary.com/word/ search.html?q=releasable; COLLINS ENGLISH DICTIONARY, https://www.collinsdictionary.com/us/dictionary/english/releasable#:~:text=Definition%2 0of%20'releasable'&text=1.,intended%20for%20release; OXFORD ENGLISH DICTIONARY, https://www.oed.com/ dictionary/releasable_adj; see also Phillips, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a [PHOSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").  In light of this definition, it would be clear to a POSITA that the term "releasably mounted" would mean that the component is mounted in such a way that it is capable of being released.  And consistent with meaning, Defendants acknowledge that the '836 Patent's specification depicts at least one embodiment where housing 1460 is releasably mounted from base member 1402.  (See Doc. No. 84 at 13.)  Further, the word "releasable" can encompasses both (1) when an item is capable of being released by hand; and (2) when an item is capable of being released via special tools.  It need not be one or the other.  As such, the Court rejects Defendants' contention that the claim term "releasably mounted" is indefinite.

Defendants propose in the alternative that the term "releasably mounted" be construed as "easily removable without tools and without loss or damage."  (Doc. No. 84 at 10, 12.)  To support this construction, Defendants contend that figures 52-59 of the '836 Patent are the only embodiment with a housing member that is releasably connected to a base member, and in that embodiment the housing member is releasable without the use of tools.  (Id. at 12–14.)  But, as Defendants themselves note, Figures 52-59 of the '836 Patent depict an "embodiment of a tightening mechanism."  '836 Patent col. 5 ll. 19–35.  "[I]t is

improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." <u>Dealertrack</u>, 674 F.3d at 1327; <u>accord</u> <u>Openwave</u>, 808 F.3d at 514.  As such, the Court rejects Defendants' attempt to limit the scope of the claims to the embodiment depicted in Figures 52-59.  And, therefore, the Court rejects Defendants' proposal that the term "releasably mounted" must mean "removable without tools."

Nevertheless, the Court agrees with Defendants that in this context the word "releasabl[e]" requires that the item at issue be releasable without loss or damage.  BOA asserts that "nowhere in Claim 8 does it suggest or imply that the releasably mounted housing component must be removed without loss or damage."  (Doc. No. 85 at 14–15.) The Court disagrees.  The common meaning of the word "releasable" implies a non-destructive release of the item at issue.  BOA does not identify anywhere in the intrinsic record where the patentee refers to something being "releasable" in a destructive manner. As such, the Court will include in its construction for this claim term the requirement that the housing member is releasable without loss or damage.

In sum, the Court rejects Defendants' contention that the claim term "releasably mounted" is indefinite.  The Court construes the claim term "releasably mounted" as "mounted in such a way that it is capable of being released without loss or damage."

      b.   <u>"a first side of the [base/housing] member" and "a second side of the [base/housing] member"</u>

Defendants argue that the claim terms "a first side of the [base/housing] member" and "a second side of the [base/housing] member" from the '836 Patent are indefinite. (Doc. No. 84 at 14–16.)  BOA contends that the claim terms are not indefinite and that no construction for the claim terms is required.  (Doc. No. 85 at 15–17.)

Independent claim 8 of the '836 patent recites "a closure system" containing, among other things, "a base member" and "a housing member:"

wherein the base member includes a recessed channel on a first side of the

base member and a tab member on a second side of the base member;

wherein the housing member includes a first tab member on a first side of the housing member and a second tab member on a second side of the housing member; and

wherein the first side of the housing member is aligned with the first side of the base member and the second side of the housing member is aligned with the second side of the base member . . . .

'836 Patent col. 51 ll. 42–65.

Defendants contend that the claim terms "a first side of the [base/housing] member" and "a second side of the [base/housing] member" are indefinite because in most embodiments described in the specification the base member and the housing member are depicted as circles, and it is well known in the mechanical and mathematical arts that a circle has no sides. (Doc. No. 84 at 15.) In response, BOA argues that Defendants' argument is misplaced because it fails to appreciate the commonly understood definition of the word "side" that is used for physical objects as opposed to the definition used for abstract mathematical shapes. (Doc. No. 85 at 16.)

BOA has provided the Court with dictionaries defining the word "side" as "either of the two halves of an object, surface, or place regarded as divided by an imaginary central line." (Doc. No. 85-8, Ex. H; see also Doc. No. 85-10, Ex. J (defining "side" as "either of two parts into which an object, surface, area, etc, can be divided, esp by a line, median, space, etc"); Doc. No. 85-5, Ex. E, Tipton Decl. ¶ 111.) See also WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 2111 (1981) (defining "side" as "a place, space, or direction with respect to a center or to a line of division (as of an aisle, river or street)"). The claimed "base member" and the claimed "housing member" are physical objects and not abstract geometric shapes. Thus, in light of the definition of the word "side" for physical objects set forth above, a POSITA would understand that the housing member and the base member can have opposite "sides," even if they are both circular in shape. And a POSITA would understand that "a first tab member" and a "a second tab member" can be placed on those opposite sides of the housing member as described in independent claim 8

and depicted in figure 59B of the specification.  See '836 Patent fig. 59B, col. 51 ll. 42–65.

In sum, a POSITA would be able to understand with reasonable certainty the scope of the claim terms "a first side of the [base/housing] member" and "a second side of the [base/housing] member."  As such, the Court rejects Defendants' contention that the claim term "a first side of the [base/housing] member" and "a second side of the [base/housing] member" are indefinite.

### 3.    The '388 Patent

a.    "the one or more radially protruding flanges is at least temporarily separated from the annular ridge by a gap"

Defendants argue that the claim term "the one or more radially protruding flanges is at least temporarily separated from the annular ridge by a gap" from the '388 Patent is indefinite. (Doc. No. 84 at 5–9; Doc. No. 89 at 1–5.)  Defendants propose in the alternative that, if the Court determines that the claim term is not indefinite, that the term be construed as "when the knob is pressed down, the pawl disk is operably coupled with the spool and a gap is created between the one or more radially protruding flanges and the annular ridge." (Doc. No. 84 at 9.)   BOA contends that the claim term is not indefinite and that no construction for the claim term is required.  (Doc. No. 85 at 17–19.)

Independent claim 11 of the '388 Patent recites a "reel based closure device," comprising, among other things: "a knob" with "one or more radially protruding flanges" and "a housing" with "an annular ridge"

> wherein the one or more radially protruding flanges of the knob is snap together couplable with the annular ridge of the housing; and

> wherein when coupled together, the one or more radially protruding flanges is at least temporarily separated from the annular ridge by a gap.

'388 Patent col. 35 ll. 1–21.  Defendants contend that the above claim language requiring that the protruding flange be "at least temporarily separated from the annular by a gap" is indefinite for two reasons.   First, Defendants argue that the word "temporarily" is indefinite. (Doc. No. 84 at 5–6.)  Second, Defendants argue that the phrase "separated . . . by a gap" is indefinite.  (Id. at 6–7.)  The Court addresses each of these indefiniteness

arguments in turn below.

Defendants contend that the word "temporarily" is indefinite because, in light of that word, the amount of time that the protruding flange and the annular ridge are separated by a gap is not reasonably certain. (Doc. No. 84 at 5.) Defendants ask: "Is one millisecond long enough for a 'temporary' gap? One second? One minute?" (Id.) The Court does not share Defendants' uncertainty. Defendants' contention fails to appreciate the Federal Circuit's repeated guidance that the reasonable certainty standard "does not require 'absolute or mathematical precision.'" BASF, 875 F.3d at 1365; see Nevro, 955 F.3d at 39 ("Th[e] standard 'mandates clarity, while recognizing that absolute precision is unattainable.'"). Thus, the '388 Patent does not need to provide a specific amount of time in order to provide a POSITA with reasonable certainty regarding the scope of this claim term.

The word "temporarily" has the commonly understood meaning of "for a brief period of time: during a limited time." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 2353 (1981); see also DICTIONARY.COM, https://www.dictionary.com/browse/temporarily (defining "temporarily" as "only for a while or for the time being; not permanently"); CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/temporarily (defining "temporarily" as "in a way that does not last for long or forever"); see also Phillips, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a [PHOSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."). That definition is enough to provide a POSITA with reasonable certainty. It tells a POSITA that sometimes the protruding flange and the annular ridge are separated by a gap for a limited period of time, but the gap between the two is not permanent (i.e., sometimes the protruding flange and the annular ridge are in contact). Accordingly, the Court rejects Defendants' contention that the word "temporarily" as used in the claims of the '388 Patent is indefinite.

1   Defendants also argue that the requirement that the protruding flange and the annular
2   ridge be "separated" "by a gap" renders the claim indefinite because the claim language
3   and specification fail to provide details regarding the size of the claimed gap.  (Doc. No.
4   84 at 6–7.)  Defendants ask: "What size gap and how much separation does it take to
5   infringe? One micron? One nanometer? One millimeter?"  (Id. at 6.)  Again, the reasonable
6   certainty standard "does not require 'absolute or mathematical precision.'"  BASF, 875
7   F.3d at 1365; see also Nevro, 955 F.3d at 39.  Therefore, the '388 Patent need not define
8   the precise measurements of the gap in order to satisfy the reasonable certainty.  The plain
9   meaning of the word "gap" is "a separation in space: an intervening distance."  WEBSTER'S
10  THIRD NEW INTERNATIONAL DICTIONARY at 935 (1981); see also Phillips, 415 F.3d at 1314.
11  In light of this, a POSITA reading this claim language would understand with reasonable
12  certainty that there must be some separation in space between the protruding flange and
13  the annular ridge for a limited period of time, and that at other times the protruding flange
14  and the annular ridge are in contact with no gap between them.  Further, as Defendants
15  themselves note, figures 12K and 12L in the specification depict an embodiment where
16  there is a temporary gap between the protruding flange and the annular ridge, thereby
17  providing further guidance to a POSITA regarding the scope of the claim term.  (See Doc.
18  No. 89 at 1.)  Accordingly, the Court also rejects Defendants' contention that the term
19  "separated . . . by a gap" as used in the claims of the '388 Patent is indefinite.

20  Next, Defendants argue that the claim term is indefinite because it is unclear when
21  infringement occurs.  (Doc. No. 89 at 3–5.)  Defendants contends that, in light of this claim
22  language, it is unclear whether infringement occurs when the article is manufactured or
23  when a user actually uses the product.  (Id. at 3–4 (citing IPXL Holdings, L.L.C. v.
24  Amazon.com, Inc., 430 F.3d 1377, 1384 (Fed. Cir. 2005); In re Katz Interactive Call
25  Processing Patent Litigation, 639 F.3d 1303, 1318 (Fed. Cir. 2011).)  Defendants' reliance
26  on IPXL and Katz is unpersuasive.  In IPXL, the Federal Circuit held that a single claim
27  that covers both an apparatus and a method of use of that apparatus is invalid for
28  indefiniteness because it is unclear whether infringement occurs when the one creates the

system or when a user actually uses the system. 430 F.3d at 1384; see also Katz, 639 F.3d at 1318. That situation is not applicable here. The claim at issue, independent claim 11 of the '388 Patent, is an apparatus claim covering a "reel based closure device." See '388 Patent col. 35 ll. 1–21. Unlike the patents at issue in IPXL and Katz, there is no claim language in independent claim 11 referring to any actions by a user of the device. Compare '388 Patent col. 35 ll. 1–21 with IPXL, 430 F.3d at 1384 ("'The system of claim 2 . . . wherein . . . the user uses the input means to either change the predicted transaction information or accept the displayed transaction type and transaction parameters.'"); Katz, 639 F.3d at 1318 ("'wherein . . . callers digitally enter data' and 'wherein . . . callers provide . . . data'"). In referring to the protruding flange and the annular ridge at times being separated by a temporary gap, the claim language is merely referring to a capability of the claimed device (i.e., the claimed reel based closure device has a protruding flange and an annular that are capable of being temporarily separated by a gap); it is not referring to any actual use of the device by a user. As such, Defendants' reliance on IPXL and Katz is misplaced, and the Court rejects it. See UltimatePointer, L.L.C. v. Nintendo Co., 816 F.3d 816, 827–28 (Fed. Cir. 2016) (finding IPXL and Katz's holdings did not apply where the claim language at issue only indicated that the relevant structures have capability and did not require any actual use).

Defendants request, in the event the Court finds the term is not indefinite, that the term be construed as "when the knob is pressed down, the pawl disk is operably coupled with the spool and a gap is created between the one or more radially protruding flanges and the annular ridge." (Doc. No. 84 at 9.) Defendants contend that this construction is proper because in figures 6J, 8D-H, 9D, 9G, 9N, 9O and 12A-O of the '388 Patent the gap between the flanges and the annular ridge operate in this manner. (See Doc. No. 84-19, Babcock Decl. ¶¶ 55–61.) But all of those figures are depictions of preferred embodiments. See '388 Patent col. 5 ll. 5–23. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims

to be so limited." Dealertrack, 674 F.3d at 1327; accord Openwave, 808 F.3d at 514.  Here, there is no clear indication that the claims should be limited in the manner proposed by Defendants.

Further, Defendants' alternative proposed construction is also improper because it would exclude other preferred embodiments referenced in the specification that do not operate in that manner.  The specification of the '388 Patent explains:

> In some embodiments, the knob 1202 and pawl disc 1204 may be axially raised or lowered by pushing or pulling on the knob 1202.  In other embodiment[s], the knob 1202 and pawl disc 1204 may be axially raised or lowered by rotating the knob 1202 in the second direction (e.g., counterclockwise) and/or by pushing a button or other mechanism.

'388 Patent col. 24 ll. 17–22.  Defendants' alternative proposed construction would exclude these described embodiments where the knob is lowered by rotation or by a push button as opposed to by pushing down on the knob.  "'A claim construction that excludes a preferred embodiment is rarely, if ever correct and would require highly persuasive evidentiary support.'"  Kaufman v. Microsoft Corp., 34 F.4th 1360, 1372 (Fed. Cir. 2022) (quoting Epos Technologies Ltd. v. Pegasus Technologies Ltd., 766 F.3d 1338, 1347 (Fed. Cir. 2014)); see Duncan Parking Techs., Inc. v. IPS Grp., Inc., 914 F.3d 1347, 1364 (Fed. Cir. 2019) ("[A] claim construction that excludes the preferred embodiment is highly disfavored.").[6]

_____

[6]    In an effort to encompass the embodiments referenced above, at the claim construction hearing, Defendants offered a slightly altered proposed construction for this claim term, which was "when the knob is [pressed down] axially lowered, the pawl disc is operably coupled with the spool and a gap is created between the one or more radially protruding flanges and the annular ridge."

The Court agrees with Defendants that this proposed construction would encompass the embodiments referenced above where the knob is axially raised and lowered by rotation or by a push button.  But the problem with this modified construction is that it is still entirely based on limitations contained in preferred embodiments described in the specification.  See '388 Patent col. 5 ll. 5–23.  "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—

34

In sum, the Court rejects Defendants' assertion that the claim term "the one or more radially protruding flanges is at least temporarily separated from the annular ridge by a gap" from the '388 Patent is indefinite.  And the Court declines to construe the claim term.[7]

---

into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."  <u>Dealertrack</u>, 674 F.3d at 1327; <u>accord</u> <u>Openwave</u>, 808 F.3d at 514.  Here, there is no clear indication that the claims should be limited in this manner.  Therefore, the Court rejects Defendants' modified construction.

[7]    At the claim construction hearing, Defendants argued that because the parties dispute the scope of this claim term, the Court must construe the claim term rather than give the term its plain and ordinary meaning.  The Court rejects this argument as it is based on an incorrect understanding of the Federal Circuit's holdings in <u>O2 Micro</u> and <u>Eon</u>.  Under <u>O2 Micro</u>, "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  <u>O2 Micro</u>, 521 F.3d at 1362.  The Federal Circuit has explained that, in some instances, a determination that a claim term needs no construction or has plain and ordinary meaning may be inadequate, such as when the term's ordinary meaning does not resolve the parties' dispute.  <u>See</u> <u>Eon</u>, 815 F.3d at 1318 (citing O2 Micro, 521 F.3d at 1361).  But that is not the case here.

Here, the parties' dispute with respect to this claim term is that Defendants contend that the claim term must specifically include the requirement that "when the knob is pressed down, the pawl disk is operably coupled with the spool and a gap is created between the one or more radially protruding flanges and the annular ridge."  And BOA's contention is that the Court should not include that specific requirement in its claim construction for this claim term.  By giving the claim term at issue its plain and ordinary meaning, the Court has rejected Defendants' proposed requirement and thereby resolved the parties' dispute with respect to the scope of this claim term in compliance with the Court's duties under <u>Eon</u> and <u>O2 Micro</u>.  <u>See, e.g.</u>, <u>ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.</u>, 694 F.3d 1312, 1326 (Fed. Cir. 2012) (finding district court did not violate the principles of <u>O2 Micro</u> by giving the claim terms their plain and ordinary meaning and rejecting a proposed construction that erroneously read limitations into the claims); <u>Summit 6</u>, 802 F.3d at 1291 (finding district court did not violate the principles of <u>O2 Micro</u> by giving claim term its plain and ordinary meaning); <u>DNA Genotek Inc. v. Spectrum Sols. L.L.C.</u>, No. 3:21-CV-00516-RSH-DDL, 2022 WL 17331255, at *29 n.30 (S.D. Cal. Nov. 29, 2022), <u>aff'd sub nom. DNA Genotek Inc. v. Spectrum Sols. LLC</u>, No. 2023-2017, 2025 WL 502040 (Fed. Cir. Feb. 14, 2025) ("By giving the claim term its plain and ordinary meaning, the Court has rejected Spectrum's proposed requirement and thereby resolved the parties' dispute . .

23-cv-01431-GPC (JLB)

4.    <u>The '020 Patent</u>

a.    <u>"pawl component"</u>

Defendants propose that the claim term "pawl component" from the '020 Patent be construed as a means-plus-function claim limitation under 35 U.S.C. § 112(f) with the corresponding structure of "pawl disk 1204 with pawl teeth and a central aperture or plurality of recesses, as shown and described in FIGs. 12A-O and Col. 20:29 through 21:6, Col. 23:8-65, and Col. 24:32-47" and the corresponding function of "allow the spool to rotate in a first direction within the housing's interior region while preventing rotation of the spool in a second direction."  (Doc. No. 84 at 23–25.)  Defendants propose, in the alternative, that, if the Court determines that the claim term is not a means-plus-function limitation, then the term should be construed as "a single unitary pawl."  (<u>Id</u>.)  BOA contends that the claim term is not subject to 35 U.S.C. § 112(f) and no construction is necessary.  (Doc. No. 85 at 20–21.)

Defendants contend that the claim term "pawl component" is a means-plus-function claim limitation under 35 U.S.C. § 112(f) because it contains the word "component," which is a nonce word.  (Doc. No. 84 at 23.)  Here, the limitation at issue – "pawl component" – does not use the precise word "means."  '020 Patent col. 34 l. 9.  Therefore, there is a rebuttable presumption that § 112(f) does not apply.  <u>See, e.g.</u>, <u>Rain</u>, 989 F.3d at 1005; <u>Fintiv</u>, 134 F.4th at 1381.  In order for this presumption to be overcome, Defendants must demonstrate "that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'"  <u>Williamson</u>, 792 F.3d at 1349.

Defendants are correct that the term "component" is a nonce word.  <u>See</u> <u>Amdocs</u>, 2018 WL 1699429, at *19 ("[N]umerous courts have found that generic terms such as

_____

. ." (citing <u>Taction Technlogy, Inc. v. Apple Inc.</u>, No. 21-CV-812 TWR (JLB), 2022 WL 18781398, at *10 n.8 (S.D. Cal. Sept. 28, 2022))).

23-cv-01431-GPC (JLB)

'component' or 'device' are nonce words."); see, e.g., Cypress Lake Software, 382 F. Supp. 3d at 621–22.  Nevertheless, "even if the claims recite a nonce term followed by functional language, other language in the claim 'might inform the structural character of the limitation-in-question or otherwise impart structure' to the claim term." MTD, 933 F.3d at 1341–42 (quoting Williamson, 792 F.3d at 1351).

BOA correctly argues that the claim language's inclusion of the word "pawl" in front of the word "component" is sufficient to impart structure to the limitation because a "pawl" is a well understood mechanical term that designates a particular structure.  (See Doc. No. 85 at 21.)  BOA has provided the Court with several technical dictionaries that contain definitions for the word "pawl" that include specific structural descriptions.  (See Doc. No. 85-11, Ex. K (defining "pawl" as: "A pivoted hook-like component which engages with a ratchet wheel.  It is used to prevent reverse rotary motion."); Doc. No. 85-12, Ex. L ("A pawl is a pivoted lever shaped to engage with a ratchet wheel to prevent motion in a particular direction."); Doc. No. 85-14, Ex. N (defining "pawl" as: "A pivoted catch, usually spring-controlled, engaging with a ratchet wheel or rack to prevent reverse motion, or to convert its own reciprocating motion into an intermittent rotary or linear motion."). In light of this, the Court rejects Defendants' contention that the claim term "pawl component" is a means-plus-function claim limitation under 35 U.S.C. § 112(f).

Defendants propose in the alternative that, if the Court finds that "pawl component" is not subject to § 112(f), then the term should be construed as a "single unitary pawl." (Doc. No. 84 at 25.)  To support this alternative proposed construction, Defendants note that Figures 12A-O from the specification display "pawl disc 1204" as a single unitary structure.  (Id. at 20, 25.)  Figures 12A-O of the '020 Patent depict a preferred "embodiment" of the claimed invention.  '020 Patent col. 5 ll. 30–31.  "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." Dealertrack, 674 F.3d at 1327; accord Openwave, 808 F.3d at 514.  Here, there is no such clear indication that the claims should

be limited in this manner.  Defendants note that the specification explains that: "Embodiments of the invention provide closure devices (hereinafter reel assemblies) with a reduced component count compared with conventional closure devices."  '020 Patent at col. 5 l. 66 to col. 6 l.1.  (See Doc. No. 89 at 9.)  But that statement is ambiguous at best as to whether the claimed pawl must be a single unitary pawl.  It is not a clear disclaimer requiring that the claimed pawl must be a single unitary pawl.  See, e.g., Textron Innovations Inc. v. Am. Eurocopter Corp., 498 F. App'x 23, 30 (Fed. Cir. 2012) ("Unless the claims, the specification, or the prosecution history require that the particular component be a single, one-piece structure, a court normally will not read that limitation into the claim.").  As such, the Court rejects Defendants' attempt to read in a limitation from the preferred embodiment disclosed in Figures 12A-O of the specification into the claims.

Further, BOA correctly notes that the specification of the '020 Patent expressly acknowledges that the pawl can include two or more parts.  The specification states: "In some embodiments, one or more of the above components may include two or more parts that are coupled together."  '020 Patent col. 22 ll. 42–44.  "'A claim construction that excludes a preferred embodiment is rarely, if ever correct and would require highly persuasive evidentiary support.'"  Kaufman, 34 F.4th at 1372; see Duncan Parking, 914 F.3d at 1364 ("[A] claim construction that excludes the preferred embodiment is highly disfavored.").  Defendants' alternative proposed construction would exclude these embodiments referenced in the specification because Defendants' proposal requires that the "pawl component" be a single unitary structure.  As such, the Court rejects Defendants' alternative proposed construction for the term "pawl component."

In sum, the Court holds that the claim term "pawl component" from the '020 Patent is not a means-plus-function claim limitation under 35 U.S.C. § 112(f).  And the Court rejects Defendants' proposed alternative construction for the claim term.  Accordingly, the Court gives the claim term "pawl component" its plain and ordinary meaning, and the Court declines to further construe the claim term.

b.    "tightening member"

Defendants propose that the claim term "tightening member" from the '020 Patent be construed as a means-plus-function claim limitation under 35 U.S.C. § 112(f) with the corresponding structure of "knob 1202 with snap-in locking protrusions 1203 and a shoulder, as shown and described in FIGs. 12A-O and Col. 20:29 through 21:6, Col. 23:8-65, and Col. 24:32-47" and the corresponding function of "causes the spool to rotate within the housing in a first direction to wind a tension member about the spool." (Doc. No. 78-1 at 38; Doc. No. 84 at 25.)  Defendants propose, in the alternative, that, if the Court determines that the claim term is not a means-plus-function limitation, then the term should be construed as "single unitary part for tightening." (Id.)  Plaintiff contends that the claim term is not subject to 35 U.S.C. § 112(f) and no construction is necessary. (Doc. No. 85 at 23–24.)

The parties agree that the claim term "tightening member" in the '020 Patent should be construed consistently with the claim term "tightening component" from the '070 Patent.  (See Doc. No. 84 at 25; Doc. No. 85 at 23.)  The Court has construed the claim term "tightening component" from the '070 Patent as a means-plus-function claim limitation under 35 U.S.C. § 112(f) with the claimed function of "causes the spool component to rotate within the housing component's interior region in the first direction to gather the tension member around the spool component's annular channel and thereby tighten the article" and the corresponding structure of "knob 218" described at 6:51-7:39 and FIGS. 2-4; "cover with grip 512" described at 8:1-20 and FIG. 5A; "knob 504" described at 8:21-43 and FIG. 5C; "knob 660" described at 8:44-11:7 and FIGS. 6A-K; "cover with grip 712" described at 11:8-43 and FIG. 7A; "cover 750" described at 11:44-62 and FIGS. 7B-C; "grip 808" described at 11:63-14:28 and FIGS 8D-J; "knob 902" described at 14:29-15:18 and FIGS. 9A-O; "knob 926" described at 15:19-44 and FIGS. 9D-F; "knob 954" described at 15:45-16:3 and FIGS 9N-O; "knob 986" described at 16:35-16:61 and FIGS. 9J-M; "knob 1102" described at 18:46-20:12 and FIGS 11A-P; and "knob

23-cv-01431-GPC (JLB)

1202" described at 20:13-24:52 and FIGS. 12A-N; "knob 1302" described at 27:42-30:67 and FIGS. 13-20B.

Accordingly, consistent with the Court's construction for the claim term "tightening component" in the '070 Patent, the Court construes the claim term "tightening member" in the '020 Patent as a means-plus-function claim limitation under 35 U.S.C. § 112(f). The claimed function of the term is "causes the spool to rotate within the housing in a first direction to wind a tension member about the spool." '020 Patent col. 34 ll. 65–67. And the corresponding structure is "knob 218" described at 6:51-7:39 and FIGS. 2-4; "cover with grip 512" described at 8:1-20 and FIG. 5A; "knob 504" described at 8:21-43 and FIG. 5C; "knob 660" described at 8:44-11:7 and FIGS. 6A-K; "cover with grip 712" described at 11:8-43 and FIG. 7A; "cover 750" described at 11:44-62 and FIGS. 7B-C; "grip 808" described at 11:63-14:28 and FIGS 8D-J; "knob 902" described at 14:29-15:18 and FIGS. 9A-O; "knob 926" described at 15:19-44 and FIGS. 9D-F; "knob 954" described at 15:45-16:3 and FIGS 9N-O; "knob 986" described at 16:35-16:61 and FIGS. 9J-M; "knob 1102" described at 18:46-20:12 and FIGS 11A-P; and "knob 1202" described at 20:13-24:52 and FIGS. 12A-N; "knob 1302" described at 27:42-30:67 and FIGS. 13-20B.

### III.    CONCLUSION

Accordingly, the Court hereby adopts the constructions set forth above.

IT IS SO ORDERED.

Dated:  May 28, 2025

Hon. Gonzalo P. Curiel
United States District Judge

23-cv-01431-GPC (JLB)